UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| | |
|---|---|
| KENNEDY LEWIS PARTNERS MASTER FUND LP AND KENNEDY LEWIS PARTNERS MASTER FUND II LP, | : Case No.: 21-cv-4690 (ALC) |
| | : |
| Plaintiffs, | : **ORAL ARGUMENT REQUESTED** |
| v. | : |
| | : |
| ABRY PARTNERS, LLC, APEX CREDIT PARTNERS, LLC, CIFC ASSET MANAGEMENT LLC, ELLINGTON MANAGEMENT GROUP, L.L.C., TRIMARAN ADVISORS MANAGEMENT, L.L.C., AND WILMINGTON SAVINGS FUND SOCIETY, FSB, | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE LENDER
DEFENDANTS' MOTION TO DISMISS OR TRANSFER VENUE**

McKool Smith, P.C.
Kyle A. Lonergan
James H. Smith
One Manhattan West, 50th Floor
395 9th Avenue
New York, NY 10001
Telephone: (212) 402-9400

John Sparacino (to apply for admission *pro hac vice*)
600 Travis St # 7000
Houston, TX 77002
Telephone: (713) 485-7300

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS .............................................................................................4

    I.       The Loan and Agreements ................................................................4

    II.      The Bankruptcy and Sale of Town Sports....................................................6

    III.    The Emergency Motion and Bankruptcy Court's Ruling ........................................7

ARGUMENT ...............................................................................................................9

    I.       Claim Preclusion Does Not Apply Here ...................................................10

        a.       The Doctrine of *Res Judicata* is Inapplicable ...........................................10

        b.       The Doctrine of Collateral Estoppel is Inapplicable................................13

    II.      The Security Agreement's "No Action" Clause is Inapplicable ..........................15

    III.    Lender Defendants' Breaches Injured Plaintiffs ...................................17

        a.       The Complaint Identifies Specific Provisions that Lender Defendants Breached. ......................................................................17

        b.       Lender Defendants Breached Each of These Provisions. ..........................18

        c.       Lender Defendants' Breaches Caused Injury to Plaintiffs.......................21

    IV.    The Motion to Transfer Should Be Denied .........................................22

CONCLUSION..........................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allen v. McCurry,*
    449 U.S. 90 (1980)....................................................................................................12

*Allen v. N.Y.C. Hous. Auth.,*
    No. 1:15-cv-00173 (ALC), 2016 U.S. Dist. LEXIS 20512 (S.D.N.Y. Feb. 19, 2016)............12

*Argonaut P'shp., L.P. v. Bankers Tr. Co.,*
    Nos. 96 Civ. 1970 (MBM), 96 Civ. 2222 (MBM), 1997 U.S. Dist. LEXIS 1092
    (S.D.N.Y. Feb. 4, 1997)...........................................................................................16

*Atkinson v. Mobil Oil Corp.,*
    614 N.Y.S.2d 36 (2d Dep't 1994)...............................................................................17

*Atl. Marine Constr. Co. v. United States Dist. Court,*
    571 U.S. 49 (2013)..............................................................................................23, 24

*Audax Credit Opportunities Offshore v. Tmk Hawk Parent,*
    2021 NY Slip Op. 50794(U) (Sup. Ct. N.Y. Cnty. 2021).................................................16, 17

*Capmark Fin. Grp., Inc. v. Goldman Sachs Credit L.P.,*
    No. 11 Civ. 7511, 2012 U.S. Dist. LEXIS 28950 (S.D.N.Y. Mar. 1, 2012)...........................23

*Cohen v. Board of Educ. of East Ramapo Cent. School Dist.,*
    84 A.D.2d 536 (2d Dep't 1981)..................................................................................12

*Credit Agricole Corp. v. BDC Fin., LLC,*
    2017 NY Slip Op. 30134(U) (Sup. Ct. N.Y. Cnty. 2017)...........................................14, 20, 21

*Eaton Vance Mgmt. v. Wilmington Sav. Fund Soc'y,*
    2018 NY Slip Op. 30727(U) (Sup. Ct. N.Y. Cnty. 2018)......................................................16

*EDP Med. Computer Sys., Inc. v. United States,*
    480 F.3d 621 (2d Cir. 2007)......................................................................................10

*Feldbaum v. McCrory Corp.,*
    Civil Action Nos. 11866, 11920, Consolidated Civil Action No. 12006, 1992 Del. Ch.
    LEXIS 113 (Del. Ch. June 1, 1992).............................................................................16

*Fernandez v. New England Motor Freight, Inc.,*
    No. 12-CV-6536 (VEC), 2015 U.S. Dist. LEXIS 85716 (S.D.N.Y. July 1, 2015) ..................18

*Gazes v. Delprete (In re Clinton St. Food Corp.),*
    254 B.R. 523 (Bankr. S.D.N.Y. 2000)..........................................................................13

*Howe v. Bank of N.Y. Mellon*,
   783 F. Supp. 2d 466 (S.D.N.Y. 2011) ......................................................................................15

*ICICI Bank, Ltd. v. Essar Glob. Fund Ltd.*,
   565 B.R. 241 (S.D.N.Y. 2017) ..........................................................................................28, 29

*In re Adelphia Recovery Tr.*,
   634 F.3d 678 (2d Cir. 2011) ...................................................................................................13

*In re Chrysler LLC*,
   405 B.R. 84 (S.D.N.Y. 2009) .................................................................................................21

*In re Coudert Bros.*,
   No. 11-cv-4949 (PAE), 2011 WL 7678683 (S.D.N.Y. Nov. 23, 2011) .................................23

*Jackman v. Tese-Milner (In re Aiolova)*,
   496 B.R. 123 (Bankr. S.D.N.Y. 2013) ..................................................................................13

*Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*,
   600 B.R. 214 (S.D.N.Y. 2019) ...............................................................................................13

*Kramer v. Showa Denko K.K.*,
   929 F. Supp. 733 (S.D.N.Y. 1996) ........................................................................................13

*Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*,
   620 B.R. 456 (S.D.N.Y. 2020) ..............................................................................................22

*Maharaj v. BankAmerica Corp.*,
   128 F.3d 94 (2d Cir. 1997) .....................................................................................................18

*Marvel Characters, Inc. v. Simon*,
   310 F.3d 280 (2d Cir. 2002) ..................................................................................................10

*McMahan & Co. v. Wherehouse Entm't*,
   65 F.3d 1044 (2d Cir. 1995) ..................................................................................................17

*Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*,
   No. 03 Civ. 5539 (NRB), 2004 U.S. Dist. LEXIS 11761 (S.D.N.Y. June 24, 2004) ..............15

*Pulka v. Edelman*,
   40 N.Y.2d 781 (1976) .............................................................................................................18

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
   992 N.Y.S.2d 687 (2014) .............................................................................................15, 16, 17

*Rexnord Holdings, Inc. v. Bidermann*,
   21 F.3d 522 (2d Cir. 1994) .....................................................................................................17

*Shah v. N.Y. State Office of Mental Health*,
   523 F. App'x 828 (2d Cir. 2013) ...........................................................................................12

*Veleron Holding, B.V. v. Stanley*,
    No. 12 Civ. 5966 (CM), 2014 U.S. Dist. LEXIS 55246 (S.D.N.Y. Apr. 2, 2014) .................13

*Victor v. Riklis*,
    No. 91 Civ. 2897 (LJF), 1992 U.S. Dist. LEXIS 7025 (S.D.N.Y. May 15, 1992) .................17

*Whalen v. Ansell Perry, Inc.*,
    No. 98 Civ. 0188 (BSJ), 2004 U.S. Dist. LEXIS 6748 (S.D.N.Y. Apr. 12, 2004) .................13

*Wilder v. World of Boxing LLC*,
    310 F. Supp. 3d 426 (S.D.N.Y. 2018) .............................................................................. 21-22

**STATUTES**

28 U.S.C. § 1404(a) .................................................................................................................22, 23

28 U.S.C. § 1412 ...........................................................................................................................22

Kennedy Lewis Partners Master Fund LP and Kennedy Lewis Partners Master Fund II LP ("Plaintiffs"), submit this memorandum of law in opposition to the Lender Defendants'[1] motion to dismiss or transfer venue (Dkt. 48, the "Motion").

## PRELIMINARY STATEMENT

This action arises out of a disastrous "credit bid" transaction orchestrated by Lender Defendants, in which they gave away an $80 million secured loan and the collateral backing the remaining $87 million secured loan for essentially nothing in return. The $167 million secured loan (the "Loan") was provided by Plaintiffs, Lender Defendants, and certain other lenders (collectively, "Syndicate Lenders") to Town Sports International, LLC ("Town Sports"), and is governed by the Credit Agreement and Security Agreement (collectively, "Agreements"). After Town Sports filed for bankruptcy and defaulted on the Loan, Lender Defendants arranged for the sale of Town Sports' assets to a newly-formed entity ("NewCo"). NewCo was to be fully funded and partially owned by the Syndicate Lenders (including Plaintiffs), and was supposed to issue the Syndicate Lenders new debt securities. As part of the sale process—and in direct violation of the Agreements—Lender Defendants unilaterally caused the contribution of $80 million of the Loan to NewCo, to be used as part of the purchase price for Town Sports' assets, *i.e.* "credit bid." In doing so, Lender Defendants failed to obtain binding commitments for promised (i) financing for NewCo of $47.5 million, and (ii) new debt securities of at least $35 million. This malfeasance resulted in $80 million of the Loan and the collateral for the entire $167 million Loan being traded away in exchange for, in Lender Defendants' own words, "zero recovery."

Now, Lender Defendants seek to avoid any consequences for their actions, arguing that their conduct did not violate the Agreements, and even if it did, the Bankruptcy Court already

---

[1] "Lender Defendants" refers to Abry Partners, LLC, Apex Credit Partners, LLC, CIFC Asset Management LLC, for and on behalf of funds and accounts managed and/or advised by it, Ellington Management Group, L.L.C., on behalf of certain funds and accounts, and Trimaran Advisors Management, L.L.C., as investment manager.

sanctioned their behavior.  Lender Defendants are wrong, and their Motion underscores precisely how their conduct breached the Agreements.  There is no dispute that, in the event of a default on the Loan, Wilmington Savings Fund Society, FSB, as Agent ("WSFS" or the "Agent"), had the exclusive authority to realize upon the Loan collateral, including through the use of a credit bid, but could only do so upon instructions from the majority of the lenders (*i.e.*, Lender Defendants). There is also no dispute that the Loan was credit bid as part of the sale of Town Sports' assets. The Bankruptcy Court confirmed this by ruling that, as a result of Lender Defendants' conduct, the contribution of the credit bid occurred as a matter of fact or equity.  Finally, Lender Defendants admit that they never instructed the Agent to credit bid the Loan.  The Agent admits this as well.

Thus, given the well-pled allegations (which Lender Defendants do not dispute) that (i) the Agreements require an instruction from Lender Defendants to the Agent in order for the Loan to be credit bid; (ii) Lender Defendants never provided such an instruction; and (iii) the Loan was credit bid as a result of Lender Defendants' conduct—Lender Defendants breached the Agreements.  These uncontested allegations require denial of the Motion.

Unable to dispute this breach of the Agreements, Lender Defendants characterize the Bankruptcy Court's approval of the sale of Town Sports' assets as retroactively "authorizing" their breach of contract, and then paint Plaintiffs' claims as an attempt to overturn that order.  This is not true.  Despite Lender Defendants' repeated (mis)characterizations, the Bankruptcy Court never ruled that the Lender Defendants' conduct, which resulted in a credit bid of the Loan, was "authorized" by the Agreements.  Rather, the Bankruptcy Court only assessed whether the credit bid had already occurred as part of the sale process—not whether such conduct was permitted by the Agreements.  In answering this question, the Bankruptcy Court ruled that, due to Lender Defendants' conduct, it would be inequitable to stop the sale of Town Sports' assets on the eve of closing.  As a result, the Bankruptcy Court deemed the credit bid to have been made as a matter of

fact or equity.  This ruling did not sanction or "authorize" Lender Defendants' conduct, much less found it consistent with the language of the Agreements.

For this reason, Lender Defendants' claim preclusion arguments fail.  As Lender Defendants point out, the doctrine of *res judicata* is meant to preclude parties from "litigating issues that were or could have been raised" in a previous action.  Here, the issue before this Court— whether Lender Defendants' conduct was in breach of the Agreements—was never litigated in the Bankruptcy Court.  Nor could it have been.  It was not until <u>after</u> the Bankruptcy Court's ruling that it was held that the credit bid occurred as a result of Lender Defendants' conduct.  Until the predicate conduct constituting the breach was determined to have taken place as a matter of fact or equity, Plaintiffs' breach of contract claim was not ripe and could not "have been raised" in the bankruptcy proceeding.

Nor does collateral estoppel apply.  That doctrine strictly requires that the <u>identical issue</u> be litigated in the prior proceeding, and that Plaintiffs had a full and fair opportunity to litigate it. Neither element is satisfied here.  As noted, the issue of Lender Defendants' breach of the Agreements was not addressed by the Bankruptcy Court.  And Plaintiffs did not have a "full and fair" opportunity to litigate the issue because the breach was not established until after the Bankruptcy Court ruled.

Lender Defendants' remaining arguments fare no better.  Lender Defendants claim that the "No Action" clause in the Security Agreement bars Plaintiffs' claim because it allegedly limits the ability to bring suit under the Agreements to the Agent, upon instructions from Lender Defendants. This is nonsensical and contrary to New York law.  Under Lender Defendants' interpretation, the "No Action" clause would prevent any party from ever asserting a breach of contract claim against Lender Defendants—not matter how flagrant or damaging the breach—because Lender Defendants would never instruct the Agent to sue themselves.  For this reason, the New York

3

courts have uniformly rejected this argument, holding that such a reading of a "No-Action" clause is "absurd."

Lender Defendants next argue for dismissal by claiming that (i) the Agreements do not impose any "duty" on Lender Defendants, making any breach impossible; and (ii) even if there was a breach, Plaintiffs' damages were caused by the Bankruptcy Court's orders, rather than Lender Defendants' conduct. Both arguments are without merit. The Complaint identifies specific provisions in the Agreements that curtail Lender Defendants' conduct. For example, Section 12.10(a) of the Credit Agreement limits Lender Defendants' "authorized" conduct to that specifically permitted by the Agreements. Section 7.1 of the Security Agreement specifically authorizes the Agent, and only the Agent, to credit bid upon instructions from Lender Defendants. Lender Defendants breached these provisions by orchestrating a sale that credit bid the Loan, without any involvement of the Agent. It was this conduct that caused the Loan to be given away for essentially nothing.

Finally, Lender Defendants' request for a transfer of this matter to the Bankruptcy Court must be denied, as it ignores the binding forum selection clause in the Credit Agreement, mandating New York as the forum. Lender Defendants do not assert that the forum selection clause is invalid or otherwise unenforceable. The law is clear that a valid forum selection clause will control, even where an action concerns a related bankruptcy proceeding. Lender Defendants offer no reason why this law can be ignored here.

## STATEMENT OF FACTS

### I.      The Loan and Agreements

This dispute arises from the disposition of $80 million (and the collateral backing the remaining $87 million) of a secured Loan made by Syndicate Lenders to Town Sports in 2013. (Complaint, Dkt. 1 at ¶ 26.) The Loan was governed by the Agreements. (*Id.* at ¶ 4.) Specifically,

the Agreements provide certain limited rights to a majority of the lenders (*i.e.*, Lender Defendants) to take certain actions, or direct the Agent to take certain actions, that would be binding on the Syndicate Lenders.  (*Id.*)

> Specifically, Section 12.10(a) of the Credit Agreement provides:
>
> Each Lender hereby agrees … except as otherwise set forth herein, any action taken by the Required Lenders … or the Collateral Agent (at the direction of the Required Lenders …) **in accordance with the provisions of this Agreement or the Security Documents**, and the exercise by the Required Lenders … or the Collateral Agent (at the direction of the Required Lenders …) **of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto**, **shall be authorized** and binding upon all of the Lenders.

(Credit Agreement, Dkt. 1-1 at §12.10(a) (emphasis added).)  Pursuant to this provision, the actions that Lender Defendants are "authorized" to take in their capacity as majority lenders must be "in accordance with the provisions of" the Agreements.

Section 7.1 of the Security Agreement further provides that <u>only</u> the Agent can enforce the Security Agreement and realize upon the security granted by the Security Agreement, upon the instructions of a majority of the lenders:

> By accepting the benefits of this Agreement and each other Security Document, the Secured Creditors expressly acknowledge and agree that this Agreement and each other Security Document may be enforced **<u>only by the action of the Collateral Agent acting upon the instructions of the Required Secured Creditors</u>** and that no other Secured Creditor shall have the right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby ….

(Security Agreement, Dkt. 1-2 at §7.1 (emphasis added).)  In other words, Section 7.1 expressly limits the ability to realize upon the collateral—including through use of a credit bid—<u>to the Agent</u>. Lender Defendants readily concede this point in the Motion.  (Motion at 9 ("Under Section 7.1 of the Security Agreement, such a transfer [*i.e.* "the right to credit bid"] would have to be executed by the Collateral Agent, following an instruction from the majority of the lenders.")[2]

---

[2] WSFS readily concedes this as well.  (WSFS Motion to Dismiss, Dkt. 51 at 4 (Section 7.1 of the Security Agreement "enumerat[es] remedies the Collateral Agent may exercise at the instruction of the Required Secured Lenders").)

Finally, Section 13.12(a) of the Credit Agreement restricts the Lender Defendants from "releas[ing] all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under all the Security Documents" without the consent of each of the lenders. (Credit Agreement §13.12(a).) As plainly stated, Lender Defendants cannot release the collateral except as expressly provided in the Agreements. This means that Lender Defendants cannot release the collateral without instructing the Agent, which Lender Defendants failed to do here.

## II.    The Bankruptcy and Sale of Town Sports

In September 2020, Town Sports filed for bankruptcy in the United States Bankruptcy Court for the District of Delaware, with Chief Judge Christopher S. Sontchi presiding, and defaulted on the loan. (Compl. at ¶¶ 2, 32.) Lender Defendants then orchestrated the sale of Town Sports' assets backing the Loan. Specifically, Lender Defendants joined up with a third party, Tacit Capital LLC ("Tacit"), to establish NewCo for the purpose of purchasing the Debtors' assets and operations from the bankruptcy estate. (*Id.* at ¶ 6.) NewCo was to be owned in part by the Syndicate Lenders and in part by Tacit. (*Id.*) As part of the sale, Lender Defendants caused $80 million of the Loan to be contributed to NewCo so that it could be included, *i.e.*, "credit bid," as part of NewCo's purchase price for Town Sports' assets, free and clear of the Syndicate Lenders' liens. (*Id.* at ¶¶ 6-7, 33-35.)

In exchange for contributing the $80 million credit bid (and releasing the liens on the remaining $87 million of the collateral backing the Loan), Lender Defendants believed the Syndicate Lenders (including Plaintiffs) would receive newly issued debt obligations of at least $35 million from NewCo and that Tacit would contribute $47.5 million in funding to NewCo. (*Id.* at ¶¶ 6-7, 34.) However, Lender Defendants and their counsel inexplicably failed to secure binding commitments for such debt and funding, resulting in $80 million of the Loan being "credit bid" in exchange only for an equity interest in a severely undercapitalized NewCo. The Bankruptcy Court

approved the sale of Town Sports' assets and operations to NewCo on November 3, 2020. ("Sale Order," Dkt. 49-7.)

Lender Defendants never instructed the Agent to contribute the Loan to NewCo. (Compl. at ¶¶ 5, 35.) Lender Defendants (and the Agent) do not dispute this. (Motion at 10 ("[A] credit bid must be executed by the Collateral Agent 'acting upon the instructions of the Required Secured Creditors; … but this step had not taken place yet."); WSFS Motion to Dismiss at 9-10.) Plaintiffs were unaware that Lender Defendants were orchestrating the sale of Town Sports and the release of the collateral without involving, much less instructing, the Agent. (*Id.* at ¶ 32.) Plaintiffs were also unaware that Lender Defendants had failed to obtain binding commitments for the promised consideration. (*Id.*) Lender Defendants' failures could not be determined from the bankruptcy proceeding until Lender Defendants moved to halt the sale, at which point it was too late to stop the credit bid. (*Id.*)

## III.    The Emergency Motion and Bankruptcy Court's Ruling

After the Bankruptcy Court approved the sale to NewCo, Tacit backed out of its (non-binding) commitment to provide $47.5 million in funding to NewCo and to cause NewCo to issue the new debt securities. (*Id.* at ¶ 38.) Instead, two new entities took the place of Tacit, but only offered $5 million in funding to NewCo and refused to issue new debt securities. (*Id.*) Realizing that this new arrangement would result in the Loan being credit bid in exchange for an equity interest in a severely undercapitalized going forward entity, on November 27, 2020, Lender Defendants moved the Bankruptcy Court to halt the sale of Town Sports' assets. ("Emergency Motion," Dkt. 49-8.)

In the Emergency Motion, Lender Defendants argued that "the credit bid was never contributed to the Buyer." (Emergency Motion at ¶ 4.) In support of this position, Lender Defendants relied on language in the Sale Order, arguing that the Sale Order contemplated the

credit bid would take place at some point in the future, but had not occurred yet.  (*Id.* ("As the credit bid was never contributed to [NewCo], [NewCo] cannot meet the conditions for closing the sale under the Asset Purchase Agreement.").)  In response, Town Sports argued that the Sale Order language supported its interpretation that the credit bid had already occurred.  (Dkt. 49-9 at ¶ 4.)

Notably, neither party argued that Lender Defendants had the legal authority to credit bid the Loan without instructing the Agent.  Lender Defendants stated unequivocally that they did not. (Emergency Motion at ¶ 18 ("[T]he ability to realize upon security, including pursuant to a credit bid, is limited to the Agent").)  Town Sports did not address that point at all.  Thus, the scope of the Agreements, and specifically whether Lender Defendants' conduct was consistent with the Agreements, was never before the Bankruptcy Court.

On November 30, 2020, Judge Sontchi held a hearing and denied the Emergency Motion from the bench, ruling that the credit bid had always been contemplated as part of the sale of Town Sports' assets, and as a result, "the transfer of the right to credit bid[] ha[s] already occurred." (11/30 Hearing Tr., Dkt. 49-10 at 27:5-6.)  Critically, Judge Sontchi did <u>not</u> hold an evidentiary hearing and did not make any ruling regarding (i) specifically how the credit bid occurred (including whether an instruction had been given), or (ii) whether Lender Defendants' conduct was consistent with the Agreements.

Instead, the Bankruptcy Court held that, based on the language of the Sale Order (not the Agreements) and the conduct of the Lender Defendants in orchestrating the sale, it would be inequitable at that late date to rule that <u>NewCo</u> had not obtained the right to credit bid the Loan as part of the sale process.  The Bankruptcy Court thus ruled that the Agent had previously transferred that right to NewCo as a matter of fact or if not, "deemed" it to have occurred as a matter of equity and thus NewCo had the authority to make the credit bid to the debtors:

> I think that the <u>sale order makes it clear</u> that the preliminaries, i.e. <u>the transfer of the right to credit bid, have already occurred and we're not awaiting that happening</u>.

… and to the extent that it didn't already occur pursuant to some sort of documents being exchanged among the parties I deemed it as a matter of law and to the extent I have to exercise equitable power here it did occur.

…

I mean it's simply inequitable, too late to allow the term lenders to pull that out from under the debtors and not to give that authority for the credit bid. So, I am going to deny the motion. I will have to figure the order out a little bit. I will put a finding in the order to the effect that the court order, not a finding, but an order that the court order that the credit right -- **the right to credit bid has been transferred to the buyer and the buyer has authority to make that credit bid and the closing can go forward.**

(*Id*. at 27:4-28:14 (emphasis added).)

That same day, the Bankruptcy Court entered an order—specifying that it was "not a finding"—that "pursuant to paragraph X of the Sale Order, the Prepetition Agent, on behalf of the Prepetition Lenders, has transferred the right to credit bid the Credit Bid Consideration to the Buyer, and the Buyer is authorized to contribute the Credit Bid Consideration at closing of the sale." ("Emergency Motion Order," Dkt. 49-12 at 2.)  As made clear by the Emergency Motion Order, the only "authority for the credit bid" that Judge Sontchi referenced at the hearing concerned NewCo's authority to credit bid the Loan pursuant to the terms of the Sale Order.  (*Id*.)  At bottom, Judge Sontchi's ruling that the transfer of the credit bid had occurred <u>despite</u> Lender Defendants admitted failure to instruct the Agent confirms that they breached the Agreements.

Subsequently, the sale closed and NewCo purchased Town Sports' assets and operations— all of the Syndicate Lenders' collateral backing the entire $167 million Loan—free and clear of any liens.  (Compl. at ¶ 11.)  Rather than receive equity in a fully-capitalized NewCo and new debt securities, Plaintiffs were left with the rights to a miniscule interest in a severely undercapitalized NewCo, which Lender Defendants described as "zero recovery."  (*Id*. at ¶¶ 11-12.)

## **ARGUMENT**

The Motion puts forward three arguments for dismissal of the Complaint: (i) the claims are barred by the doctrines of *res judicata* and collateral estoppel (Motion at 13-18); (ii) the claims are

barred by the Security Agreement's "No Action" clause (*id.* at 18-20); and (iii) Plaintiffs fail to adequately state the elements of breach, causation, and damages. (*id.* at 20-23.) Alternatively, Lender Defendants argue this action should be transferred to the Bankruptcy Court because the underlying bankruptcy case is pending there. Each of these arguments is without merit.

## I.      Claim Preclusion Does Not Apply Here

### a.      The Doctrine of *Res Judicata* is Inapplicable

Lender Defendants argue that, because Judge Sontchi's orders authorized the debtors to make the credit bid and approved the sale of Town Sports' assets, *res judicata* precludes Plaintiffs' claims. According to Lender Defendants, the Sale Order and Emergency Motion Order have preclusive effects because they constitute final judgments on the merits that Plaintiffs should have challenged in the bankruptcy proceeding. (Motion at 13-15.) This is wrong, as it (i) misstates the issues that were actually before the Bankruptcy Court; (ii) incorrectly assumes Plaintiffs could have asserted their claims in the bankruptcy proceeding; and (iii) mischaracterizes Plaintiffs' claims as seeking to upset the Sale Order and Emergency Motion Order.

*First*, under federal law,[3] *res judicata* only applies if the earlier decision involved "the same cause of action." *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007). Here, the Sale Order and Emergency Motion Order <u>did not address</u> the claims Plaintiffs assert in this lawsuit. The question before the Bankruptcy Court was whether Lender Defendants had transferred the right to credit bid to NewCo and NewCo had the authority to credit bid. (Emergency Motion at ¶ 13.) In contrast, the question here is whether Lender Defendants causing the transfer of the credit bid to NewCo, without instructing the Agent, was in violation of the Agreements. (Compl. at ¶ 52 (alleging "Lender Defendants did not have the authority to transfer and/or credit bid, or commit the Agent to transfer and/or credit bid").)

---

[3] Federal law determines the preclusive effect of a federal judgment. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

To get around this discrepancy, Lender Defendants confuse the issue. Lender Defendants describe Judge Sontchi's ruling, in which he held that the Agent transferred the right to credit bid as a matter of fact or equity, and NewCo was "authorized" to credit bid, as addressing whether the Agent "was authorized to contribute the secured claims and related right to credit bid" under the Agreements. (Motion at 16.) Note the sleight of hand. There is a clear distinction between whether an event occurred and whether the event (having occurred) is consistent with contractual obligations. Moreover, there is a difference between NewCo being authorized to credit bid and the authorization of the Lender Defendants' (and Agent's) conduct under the Agreements. These differences are fatal to Lender Defendants' *res judicata* argument.

Lender Defendants further attempt to confuse the issue by conflating the Bankruptcy Court's analysis of the Sale Order with an interpretation of the Agreements. This too should be rejected. As discussed *supra*, Judge Sontchi only assessed whether the right to credit bid had already been transferred to NewCo and NewCo was authorized to credit bid. In finding in the affirmative, Judge Sontchi relied on the language of the Sale Order, finding that it contemplated the credit bid to have already been transferred, and did not address the contours of the Agreements. This is apparent from the Bankruptcy Court's own words at the November 30 hearing: "the sale order makes it clear that the preliminaries, *i.e.* the transfer of the right to credit bid, have already occurred." (11/30 Hearing Tr. at 27:4-6.) The Bankruptcy Court's subsequent order further made clear his ruling was made "pursuant to paragraph X of the Sale Order," and not any interpretation of the Agreements. (Emergency Motion Order at 2.) Indeed, the Emergency Motion requested "entry of a temporary injunction to enjoin the closing of the Sale until such time as the Court interprets the Sale Order to determine if the Buyer can act to provide the purchase price—including the credit bid consideration—to the Debtors as required under the terms of Asset Purchase

Agreement." (Emergency Motion at ¶ 13.) As a result, the Court never addressed or interpreted the language of the Agreements.

*Second*, while *res judicata* prevents parties from "relitigating issues that were or could have been raised in that [prior] action[,]" (Motion at 13), this confirms that the doctrine does not apply. Because it was uncertain whether the right to credit bid had in fact been transferred until <u>after</u> the Bankruptcy Court denied the Emergency Motion (indeed, up to that point, Lender Defendants maintained it had not been), Plaintiffs possessed no breach of contract claim until that time. Thus, the claims asserted here could not "have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).

It is undisputed that "[c]laims arising subsequent to a prior action that could not have been brought in that prior action 'are not barred by res judicata regardless of whether they are premised on facts representing a continuance of the same course of conduct.'" *Shah v. N.Y. State Office of Mental Health*, 523 F. App'x 828, 830 (2d Cir. 2013) (quoting *Storey v. Cello Holdings*, L.L.C., 347 F.3d 370, 383 (2d Cir. 2003)); *Allen v. N.Y.C. Hous. Auth.*, No. 1:15-cv-00173 (ALC), 2016 U.S. Dist. LEXIS 20512, at *12 (S.D.N.Y. Feb. 19, 2016) (Carter, J.) (same). This is for good reason. "'While the [prior] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case.'" *Shah*, 523 F. App'x at 830 (alteration in original) (quoting *Storey*, 347 F.3d at 383).[4]

*Finally*, Lender Defendants' last attempt to save their *res judicata* argument is to rely on a misdirection: that Plaintiffs are seeking to "challenge" the bankruptcy sale. (Motion at 15.) This

---

[4] *See also Maharaj v. BankAmerica Corp.*, 128 F.3d 94, 97 (2d Cir. 1997) ("[A]s a matter of logic, when the second action concerns a transaction occurring after the commencement of the prior litigation, claim preclusion does not generally come into play."); *Cohen v. Board of Educ. of East Ramapo Cent. School Dist.*, 84 A.D.2d 536, 537 (2d Dep't 1981) (*res judicata* will not bar lawsuit "based upon events which occurred subsequent to the commencement of the prior proceeding").

is not true.  While bankruptcy sale orders may have a preclusive effect related to claims that seek to undo those orders,[5] here Plaintiffs are seeking no such relief; Plaintiffs are simply seeking to recover damages caused by Lender Defendants' breach of the Agreements.  A judgment against Lender Defendants would have no impact on "the bedrock principle of finality attaching to completed bankruptcy sales."  (*Id.*)  Lender Defendants do not, and cannot, show otherwise.

b.    The Doctrine of Collateral Estoppel is Inapplicable

Collateral estoppel is inapplicable to Plaintiffs' claims.  As Lender Defendants admit, collateral estoppel only bars the litigation of an issue where "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits.'" (Motion at 16.)  Here, an "identical" breach of contract claim was not at issue in the bankruptcy proceeding, and even if it was, Plaintiffs did not have a "full and fair opportunity" to litigate that issue.

The requirement that the issue from the prior action be "identical" is a stringent one.  "A plaintiff must do more than show that the issues in the two cases are very similar. In order for a plaintiff to invoke the doctrine of collateral estoppel, he must show that the issues in the two proceedings are truly identical."  *Whalen v. Ansell Perry, Inc*., No. 98 Civ. 0188 (BSJ), 2004 U.S. Dist. LEXIS 6748, at *14 (S.D.N.Y. Apr. 12, 2004) (internal citations and quotations).[6]

---

[5] All of the cases cited by Lender Defendants for the proposition that *res judicata* applies to bankruptcy court sale orders can be distinguished on these grounds.  *See Jackman v. Tese-Milner (In re Aiolova)*, 496 B.R. 123, 129-30 (Bankr. S.D.N.Y. 2013) (precluding claim for constructive trust over property sold at bankruptcy sale); *Gazes v. Delprete (In re Clinton St. Food Corp.)*, 254 B.R. 523, 531 (Bankr. S.D.N.Y. 2000) (precluding fraud claims seeking to avoid bankruptcy sale); *In re Adelphia Recovery Tr.*, 634 F.3d 678, 695 (2d Cir. 2011) (*res judicata* prohibited party from challenging the "validity of the price paid at that time and confirmed by the court" in an asset sale).

[6] *See also Kramer v. Showa Denko K.K.*, 929 F. Supp. 733, 750 (S.D.N.Y. 1996) ("Courts prohibit the use of collateral estoppel … if the issues in the two proceedings are not truly identical. … Collateral estoppel is inapplicable in cases where there is any ambiguity regarding which issues actually were decided in the prior proceeding."); *Veleron Holding, B.V. v. Stanley*, No. 12 Civ. 5966 (CM), 2014 U.S. Dist. LEXIS 55246, at *31 (S.D.N.Y. Apr. 2, 2014) ("Even where issues appear to be factually identical, they are not identical if they were determined in a prior proceeding pursuant to different legal standards that would apply in the second proceeding.") (citing *Jim Beam Brands Co. v. Beamish & Crawford Ltd.* 937 F.2d 729, 734-35 (2d Cir. 1991)).

13

Plaintiffs' claims are not "identical" to an issue raised and resolved in the bankruptcy proceeding. No one—not Plaintiffs, not Town Sports, not the Bankruptcy Court—ever accused Lender Defendants of breaching the Agreements before the institution of this action. Nor did the Bankruptcy Court ever assess whether Lender Defendants' conduct fit within the contours of the Agreements or make any ruling in this regard.[7]  Lender Defendants' argument to the contrary relies on their same mischaracterization of the Bankruptcy Court's ruling, arguing that the court's authorization of NewCo's credit bid also authorized Lender Defendants' and Agent's breach of the Agreements.

Even further afield is Lender Defendants' assertion that whether they "breached Section 13.12(a) of the Credit Agreement … was similarly resolved by Judge Sontchi's prior orders." (Motion at 17.)  Section 13.12(a), which prohibits the release of all or substantially all of the collateral (unless authorized by the Agreements) without consent of each lender, <u>was not mentioned once</u> by either the Court or any party to the bankruptcy.  The Sale Order did not touch on Section 13.12(a) of the Credit Agreement, nor would a ruling that Lender Defendants breached this provision require this Court to upend that Order.  *See Credit Agricole Corp. v. BDC Fin., LLC*, 2017 NY Slip Op. 30134(U) (Sup. Ct. N.Y. Cnty. 2017) (permitting claims for breach of a virtually identical consent provision to proceed to trial despite the underlying transaction being approved by the bankruptcy court).

Finally, even if an identical issue had been raised in the bankruptcy proceeding, Plaintiffs did not have a full and fair opportunity to litigate the issue.  Plaintiffs did not have claims against

---

[7] While Lender Defendants cited Sections 12.10(a) of the Credit Agreement and 7.1 of the Security Agreement in the Emergency Motion, they did so to argue that only the Agent can credit bid the Loan and the Agent had not done so. (Emergency Motion at ¶¶ 8, 24.)  The Bankruptcy Court subsequently ruled that the Agent had credit bid the Loan as a matter of fact or equity, irrespective of whether the proper procedures were followed.  (11/30 Hearing Tr. at 27:5-6, 19-22 ("[T]he transfer of the right to credit bid, have already occurred and we're not awaiting that happening … [T]o the extent that it didn't already occur pursuant to some sort of documents being exchanged among the parties I deemed it as a matter of law and to the extent I have to exercise equitable power here it did occur.").

Lender Defendants and the Agent until the Bankruptcy Court ruled that the credit bid had been contributed to NewCo.  As a result, this Court cannot find that Plaintiffs had a "full and fair opportunity" to litigate Lender Defendants' breach in the bankruptcy proceeding.

## II.   The Security Agreement's "No Action" Clause is Inapplicable

Lender Defendants contend that the "No Action" clause in Section 7.1 of the Security Agreement bars the instant suit.  (Motion at 18-20.)  This is incorrect and ignores binding law holding that similar "No Action" clauses do <u>not</u> bar inter-party breach of contract claims.

The "No Action" clause is part of Section 7.1, which addresses what "remedies" are available when "any Event of Default shall have occurred and be continuing."  (Security Agreement § 7.1.)  In the event of such a default, Section 7.1 states that:

> [T]his Agreement and each other Security Document may be enforced only by the action of the Collateral Agent acting upon the instructions of the Required Secured Creditors and that no other Secured Creditor shall have any right individually to seek to enforce or to enforce this Agreement or to realize upon the security to be granted hereby.

The plain meaning of such language is that, in the event of default, only the Agent, acting upon instructions of the majority of lenders, can pursue the various <u>remedies</u> outlined in the Security Agreement vis-à-vis <u>the Borrower</u>.[8]  This language does <u>not</u> bar inter-party breach of contract disputes, a fact well recognized by New York courts.  *See Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 473 (S.D.N.Y. 2011) ("Where a 'no action' clause relates to an Event of Default by its own terms, it does not bar a plaintiff from seeking a remedy for a claim outside the scope of the 'no action' clause, including seeking damages for mismanagement of the trust collateral and a failure to safeguard plaintiff's rights." (internal quotation marks omitted)); *Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.*, No. 03 Civ 5539 (NRB), 2004 U.S. Dist. LEXIS

---

[8] As the Court of Appeals recognized, the purpose of "No Action" clauses is "to protect <u>issuers</u> from the expense involved in defending [individual] lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors."  *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 992 N.Y.S.2d 687, 698 (2014) (alteration in original) (emphasis added) (internal citation and quotation marks omitted).

11761, at \*14 (S.D.N.Y. June 24, 2004) ("Where, as here, a 'no action' provision applies by its terms to only claims relating to an 'Event of Default' seeking payment on the notes themselves, such clauses do not prevent noteholders from bringing extra-contractual tort claims or breach of contract claims that are not of the type to which the 'no action' provision, by its terms, applies.").[9]

This law is only logical. As the Court of Appeals recognized, if "No Action" clauses are expanded beyond debt or collateral enforcement suits to include breach of contract suits against a trustee or an agent (or in this case, the majority lenders), it would lead to the "absurd" result of requiring "the debenture holders to ask the Trustee to sue itself" pursuant to such a clause. *Quadrant*, 992 N.Y.S.2d at 698 ("There are claims which, by law, cannot be prohibited by a no-action clause, most notably claims against the trustee.") (quoting *Cruden v. Bank of New York*, 957 F.2d 961 (2d Cir. 1992) (permitting suit against trustees even though "No Action" provision was not specifically limited to actions against issuer)).[10]

The cases cited by Lender Defendants hold no different.[11]   In fact, the cases cited by Lender Defendants in which a "No Action" clause acted to bar claims involved claims against the

---

[9] *See also Argonaut P'shp., L.P. v. Bankers Tr. Co.*, Nos. 96 Civ. 1970 (MBM), 96 Civ. 2222 (MBM), 1997 U.S. Dist. LEXIS 1092, at \*19 (S.D.N.Y. Feb. 4, 1997) ("[T]he 'no action' clause bars the Noteholders from bringing suit themselves against the issuer, the guarantors, or the pledged property. The 'no action' clause does not bar suit by the Noteholders against the trustees.").

[10] Lender Defendants assert that the uniform caselaw denying application of "No Action" clauses to inter-party breach of contract cases is inapplicable here because they assert that the bulk of those cases concern claims against the agent/trustee and not between fellow creditors. (Motion at fn. 4.) This is wrong for at least two reasons. First, the caselaw <u>does</u> address claims between fellow creditors. *See, e.g.*, *Audax Credit Opportunities Offshore v. Tmk Hawk Parent*, 2021 NY Slip Op. 50794(U), at \*\*7 n.4 (Sup. Ct. N.Y. Cnty. 2021). Second, the cases that address claims against the agent or trustee are equally applicable as to claims against majority lenders. The Court of Appeals stated that it would be "absurd" to apply no action clauses to claims against the trustee where the trustee was the only party able to bring suit, as it is nonsensical to have a party sue itself. *Quadrant*, 992 N.Y.S.2d at 698. This same logic applies to the "No Action" clause in the Credit Agreement, which states that the Security Agreement may be enforced "only by the action of the Collateral Agent acting <u>upon the instructions of the Required Secured Creditors</u> [*i.e.* the Lender Defendants]." (Security Agreement § 7.1.) It would be equally "absurd" to require the Lender Defendants to instruct the Agent to sue themselves, and equally absurd to absolve Lender Defendants from any liability for their breach of contract.

[11] *See Feldbaum v. McCrory Corp.*, Civil Action Nos. 11866, 11920, Consolidated Civil Action No. 12006, 1992 Del. Ch. LEXIS 113, at \*23-24 (Del. Ch. June 1, 1992) ("[B]ondholders will be excused from compliance with a no-action provision where they allege specific facts which if true establish that the trustee itself has breached its duty under the indenture or is incapable of disinterestedly performing that duty."); *Eaton Vance Mgmt. v. Wilmington Sav. Fund*

16

bond issuer or borrower, not breach of contract claims between fellow creditors. *See McMahan &*
*Co. v. Wherehouse Entm't*, 65 F.3d 1044, 1046 (2d Cir. 1995) (claims against bond issuer); *Victor*
*v. Riklis*, No. 91 Civ. 2897 (LJF), 1992 U.S. Dist. LEXIS 7025, at *2-5 (S.D.N.Y. May 15, 1992)
(claims asserted against issuer and related entities, not fellow noteholders).[12]

### III.   Lender Defendants' Breaches Injured Plaintiffs

Lender Defendants next argue for dismissal of the Complaint on the grounds that the
Complaint does not identify (i) any "duty" of Lender Defendants under the Agreements (Motion
at 20-21); (ii) any conduct that breached the Agreements (*id*. at 21-22); or (iii) any causation or
damages (*id*. at 22).  As set forth below, each of these arguments fail.

#### a.   The Complaint Identifies Specific Provisions that Lender Defendants Breached.

In order to state a claim for breach of contract, the plaintiff must allege (1) a contract; (2)
performance of the contract by one party; (3) breach by the other party; and (4) damages. *Rexnord*
*Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994).  The pleadings also "must allege
the provisions of the contract upon which the claim is based." *Atkinson v. Mobil Oil Corp.*, 614
N.Y.S.2d 36, 37 (2d Dep't 1994).  Here, the Complaint does just that, identifying three contractual
provisions that place specific restrictions on Lender Defendants' conduct:

- Section 12.10(a) of the Credit Agreement mandates that Lender Defendants, when acting in their capacity as majority lenders, may only take actions that are in conformance with the Agreements.  (Compl. at ¶ 50 (quoting Credit Agreement § 12.10(a).)

---

*Soc'y*, 2018 NY Slip Op. 30727(U), at **7 (Sup. Ct. N.Y. Cnty. 2018) ("No Action" clause only applies where
minority lenders' "contractual rights are not alleged to have been violated and the trustee is not alleged to have engaged
in misfeasance or abdication of its responsibilities"); *Audax*, 2021 NY Slip Op 50794(U), at **7 n.4 ("No Action"
clause did not apply to breach of contract claims asserted by minority lenders against majority lenders).

[12] Finally, even if the "No Action" clause did apply to Plaintiffs' claims, by its own terms, the "No Action" clause
only applies to the Security Agreement, not the Credit Agreement.  The "No Action" clause is specifically limited to
enforcement of "this Agreement and each Security Document," *i.e.* the Security Agreement.  New York law is clear
that "No Action" clauses will be "strictly construed" and read "to give effect to the precise words and language used."
*Quadrant*, 992 N.Y.S.2d at 694 (collecting cases).  The term "Credit Agreement" is a separately defined term under
the Security Agreement.  As such, it cannot be deemed to be included by the term "this Agreement" or the undefined
term "Security Document."  Thus, even if the "No Action" clause were applicable here, it would only apply to
Plaintiffs' claim of breach of Section 7.1 of the Security Agreement, and not to Plaintiffs' claims for breach of the
Credit Agreement.

- Section 7.1 of the Security Agreement states that only the Agent, acting upon the instructions of a majority of lenders, may act to realize upon the Loan's collateral. (Compl. at ¶ 51 (quoting Security Agreement § 7.1).)

- Section 13.12(a) of the Credit Agreement requires the consent of each lender in order to amend or waive rights in the Agreements by releasing the collateral other than as expressly provided in the Agreements (Compl. at ¶ 66 (quoting (Credit Agreement § 13.12(a).)

Each of these provisions expressly restricts the conduct of the Lender Defendants or provides that conduct such as credit bidding the Loan is the sole province of the Agent, and thus prohibits Lender Defendants from undertaking such conduct themselves.[13]

     b. <u>Lender Defendants Breached Each of These Provisions.</u>

Lender Defendants <u>admit</u> that they never instructed the Agent to contribute the credit bid. (Motion at 10 ("[N]o direction [to credit bid] had been given by the Lender Defendants.").)  By causing the transfer of the credit bid to NewCo without instructing the Agent, Lender Defendants (i) breached Section 7.1 of the Security Agreement because they undertook activity that was limited solely to the Agent; (ii) breached Section 12.10(a) of the Credit Agreement because their conduct was not in "accordance" with the Agreements (namely Section 7.1 of the Security Agreement); and (iii) breached Section 13.12(a) of the Credit Agreement because their conduct both waived Plaintiffs' rights in the collateral and effectively amended the Credit Agreement without Plaintiffs' consent.  The Complaint pleads each of these violations.  (Compl. at ¶¶ 47-53; 63-69.)   Lender Defendants are wrong that "Plaintiffs do not plead what the Lender Defendants could or should have done differently to vindicate the Security Agreement."  (Motion at 21.) Plaintiffs allege that Lender Defendants should have instructed the Agent to credit bid the Loan, as is required by the Agreements.  (Compl. at ¶¶ 8-11, 35, 43, 52.).

---

[13] Contrary to Lender Defendants' position, Plaintiffs are not required to identify an "actionable duty" owed by Lender Defendants.  (Motion at 20-21.)  The cases cited in support of this proposition are inapposite, as they concern claims for common law <u>negligence</u>, not breach of contract.  *See Fernandez v. New England Motor Freight, Inc.*, No. 12-CV-6536 (VEC), 2015 U.S. Dist. LEXIS 85716, at *4 (S.D.N.Y. July 1, 2015) (analyzing indemnification claim based on negligence, not breach of contract); *Pulka v. Edelman*, 40 N.Y.2d 781, 781 (1976) (analyzing negligence claim).

Lender Defendants' only response to these allegations appears to be that because they had the ability to instruct the Agent to credit bid the Loan, they had the "authority" to credit bid the Loan themselves.  (Motion at 22.)  This is incorrect, as it conflicts with the plain language of the Agreements, which state that the collateral may be realized "only by the action of the Collateral Agent acting upon the instructions of the Required Secured Creditors."  (Security Agreement § 7.1.)  Lender Defendants repeatedly admitted the same in the Emergency Motion (Emergency Motion at ¶ 8 ("The Agent [is] the party with the right to credit bid on behalf of the Prepetition Lenders")) and even in the Motion.  (Motion at 9.)[14]

Lender Defendants' newfound expansion of their authority is also inconsistent with the purpose of the Agreements as a whole.  Because the Agent has the sole authority to dispose of the collateral, the Credit Agreement creates liability for the Agent for gross negligence.  Thus, if the Agent engages in grossly negligent conduct relating to its duties under the Agreements (such as trading an $80 million Loan obligation for nothing), it may be held responsible.  The Lender Defendants cannot circumvent this lender protection by causing the credit bid without instructing the Agent, and then disclaiming any liability under the Agreements.  Such an interpretation would render the protection provided to minority lenders in the form of recourse against the Agent illusory.

Lender Defendants are also wrong that Judge Sontchi's order "authorized" their conduct as permissible under the Agreements.  (Motion at 22.)  As stated above, the Emergency Motion Order only authorized NewCo to make the credit bid and held that the contribution of the credit bid occurred as a matter of fact or equity, and did not address whether Lender Defendants' failure

---

[14] In direct contravention of their earlier position, Lender Defendants now argue that they were authorized to unilaterally credit bid the Loan because such conduct was "reasonably incidental" to their authority to instruct the Agent to do so.  (Motion at 22.)  This is nonsensical.  A power that is "reasonably incidental" to an express one is necessarily ancillary and cannot contradict the express authority itself.

to instruct the Agent was in compliance with the Agreements.   Lender Defendants cannot retroactively graft such a finding onto the Order in order to avoid the repercussions of their breach.

Finally, Lender Defendants argue that the contribution of the credit bid and release of collateral did not violate Section 13.12(a) of the Credit Agreement because it was not an "amendment" of the Credit Agreement and the sale was approved by the Bankruptcy Court. (Motion at 23.)  This is incorrect.

Section 13.12(a) of the Credit Agreement concerns "Amendment[s], Waiver[s], etc.," and provides that, "without the consent of each Lender", all or substantially all of the collateral may not be released except as expressly provided in the Agreements.  (Credit Agreement § 13.12(a).) Ordinarily, a credit bid by the Agent, at the direction of the Lender Defendants, could constitute a release of the collateral that is "expressly provided in" the Agreements.  (Security Agreement § 7.1(iv).)  But that is not what happened here.  Because Lender Defendants' conduct resulted in the contribution of the Loan to credit bid without an instruction to the Agent, Lender Defendants breached the express provisions of the Security Agreement.  Thus, the release of the collateral was not "expressly provided in"—rather it was directly contrary to—the Agreements, and Lender Defendants' failure to obtain consent constitutes a breach of Section 13.12(a).

This is consistent with the caselaw.  *Credit Agricole* presents a nearly identical scenario and is instructive on this point.  Like the instant case, *Credit Agricole* concerned a credit bid transaction where a newly-formed entity to be owned by lenders purchased the debtor in exchange for debt forgiveness (among other things).  2017 NY Slip Op. 30134(U), at **8-15.  As part of the credit bid transaction, which was approved by the bankruptcy court, the majority lenders directed the agent to extinguish the loan and release all liens/security interests on that loan.  *Id*. at **12-13. Minority lenders brought suit alleging breach of a provision nearly identical to Section 13.12(a). *Id*. at **15-17.  Notwithstanding the approval of the bankruptcy court and lack of "formal"

20

amendment, the court permitted this claim to proceed to trial because—as is the case here—there was evidence that the manner in which the credit bid occurred was inconsistent with the loan documents, and in such a scenario, consent of each lender was required to release the collateral. *Id*. at **25.[15]

     c.  Lender Defendants' Breaches Caused Injury to Plaintiffs.

   The Complaint clearly pleads both causation and damages.  But for Lender Defendants' breach, the Agent would have been involved in the sale process and held to the gross negligence standard set forth in Section 12.02(a) of the Credit Agreement.  (Compl. at ¶¶ 35, 57-59.)  By exercising the slightest modicum of diligence (that the Lender Defendants failed to exercise), the Agent would have realized that the proposed sale structure failed to secure binding commitments to both adequately capitalize NewCo and obtain new debt securities for the Syndicate Lenders, and would have secured those obligations or halted the transaction.  (*Id.* at ¶¶ 8-12.)  This is consistent with Judge Sontchi's ruling that the sale could have been averted if someone had objected at an earlier stage in the process.  (11/30 Hearing Tr. at 27:3-15.)  This in turn would have left Lender Defendants and the Agent with the ability to construct a different NewCo and/or purchase structure, virtually any of which would have provided a better outcome than the "zero recovery" outcome orchestrated by Lender Defendants.  That Judge Sontchi ultimately approved the transaction has no bearing on causation, as it was "a normal or foreseeable consequence of the situation created by" Lender Defendants' conduct.  *Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 447 (S.D.N.Y. 2018) (internal citation and quotation marks omitted).

---

[15] Lender Defendants only cite one case in support of their position: *In re Chrysler LLC*, 405 B.R. 84 (S.D.N.Y. 2009). But *Chrysler* is inapposite.  In that case, the objecting creditors argued that consent was required in order to enter into a credit bid transaction, but <u>did not</u> contest the manner in which the credit bid was conducted.  *Id*. at 102-03.  Further, since the *Chrysler* decision contains no discussion of the operative loan agreement's provisions, the case is of little precedential value here.

**IV.     The Motion to Transfer Should Be Denied**

In requesting a transfer of "any surviving claims" to the Bankruptcy Court, Lender

Defendants all but ignore the binding forum selection clause in the Credit Agreement, which

<u>requires</u> "any legal action" to be brought in New York.[16]  The Supreme Court has made clear that

a "valid forum-selection clause should be given controlling weight in all but the most exceptional

cases."  *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 63 (2013) (internal

quotation marks, citations, and brackets omitted).  No exceptional circumstances exist here, and

Lender Defendants do not argue otherwise.  Lender Defendants' request for a transfer must be

denied for this reason alone.[17]

Lender Defendants' primary justification for its request for a transfer is the false assertion

that 28 U.S.C. § 1412 applies, and thus there is some "presumption" that the Bankruptcy Court is

the appropriate forum.  This is mistaken.  Section 1412 only applies to actions that are deemed

"core" to the bankruptcy, while motions for transfer in "non-core" or "related to" proceedings are

governed by 28 U.S.C. § 1404(a).  *ICICI Bank*, 565 B.R. at 248.

Lender Defendants do not, and cannot, explain how this action constitutes a core

proceeding.  "The determination of whether a contract action is a core proceeding or a non-core

proceeding also requires consideration of '(1) whether [the] contract is antecedent to the

reorganization petition; and (2) the degree to which the proceeding is independent of the

reorganization.'"  *Id.* (quoting *Universal Oil Ltd. v. Allfirst Bank (In re Millennium Seacarriers,*

*Inc.*), 419 F.3d 83, 97 (2d Cir. 2005)).  "The critical question in determining whether a contractual

---

[16] In no uncertain terms, Section 13.08 of the Credit Agreement provides that "ANY LEGAL ACTION OR
PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT SHALL BE
BROUGHT IN THE COURTS OF THE STATE OF NEW YORK OR OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK[.]"  (Credit Agreement § 13.08 (emphasis in original).)

[17] *See ICICI Bank, Ltd. v. Essar Glob. Fund Ltd.*, 565 B.R. 241, 244 (S.D.N.Y. 2017) (denying motion to transfer
breach of contract claim to related bankruptcy proceeding due to forum selection clause); *Zohar CDO 2003-1, Ltd. v.
Patriarch Partners, LLC*, 620 B.R. 456, 469 (S.D.N.Y. 2020) (same).

dispute is core by virtue of timing is not whether the *cause of action* accrued post-petition, but whether the *contract* was formed post-petition." *Id.* (quoting *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999*); see also In re Coudert Bros.*, No. 11-cv-4949 (PAE), 2011 WL 7678683, at *5 (S.D.N.Y. Nov. 23, 2011) ("Where a contract sued upon was formed prior to the bankruptcy petition, it will generally be highly unlikely that a proceeding based on that contract turns on the bankruptcy laws.").

Here, the Agreements were all formed pre-petition.  (Compl. at ¶¶ 26-27.)  Moreover, "the claims do not involve rights created by the bankruptcy laws, nor could the claims exist only in a bankruptcy case or in a court with federal bankruptcy jurisdiction." *ICICI Bank*, 565 B.R. at 249. Thus, this action is only "related to" the bankruptcy proceeding, and 28 U.S.C. § 1404(a) applies.[18]

Under Section 1404(a), there is no "presumption" that the Bankruptcy Court is the appropriate forum for this action.[19]  *ICICI Bank*, 565 B.R. at 250-52.  Rather, courts in the Second Circuit will consider the following non-exclusive list of factors: (1) the convenience of the witnesses and the availability of process to compel the attendance of unwilling witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the relative means of the parties; (6) the comparative familiarity of each district with the governing law; (7) the weight accorded to the plaintiff's choice of forum; and (8) judicial economy and the interests of justice.  *Id*. at 250 (quoting *Bank of Am., N.A. v. Wilmington Trust FSB*, 943 F. Supp. 2d 417, 426 (S.D.N.Y. 2013)).

Here, underline each and every one of these factors favors denial of the motion for transfer:

---

[18] Moreover, even if this matter is deemed to be "core," the forum selection clause still controls.  *See Keybank Nat'l Ass'n v. Franklin Advisers, Inc.*, 600 B.R. 214, 236 (S.D.N.Y. 2019) (notwithstanding the case being deemed a "core" bankruptcy proceeding, the forum selection clause controls).

[19] Even if there were a presumption that the Bankruptcy Court was the appropriate forum in the first instance, the confirmation of Town Sports' Chapter 11 Plan "substantially weakened" any such presumption.  *Capmark Fin. Grp., Inc. v. Goldman Sachs Credit L.P.*, No. 11 Civ. 7511, 2012 U.S. Dist. LEXIS 28950, at *10-11 (S.D.N.Y. Mar. 1, 2012) ("[A]fter a 'plan has been confirmed by the Bankruptcy Court, any presumption in favor of maintaining the venue … before the Bankruptcy Court is substantially weakened.'") (quoting *In re Northwest Airlines Corp.*, 384 B.R. 51, 61-62 (S.D.N.Y. 2008)).

- Six of the eight parties (which includes potential witnesses) are located in New York City or the tristate area versus one party located in Delaware;

- Counsel for all of the parties (including their bankruptcy counsel) are located in New York, not Delaware;

- As a result of the above, all or substantially all of the negotiations for the sale and credit bid all took place in New York;

- The Credit Agreement contains a New York choice of law provision, and the parties agree that New York law is applicable (Credit Agreement § 13.08);

- Plaintiffs' choice of forum is New York, as mandated by the forum selection clause; and

- The interests of justice are furthered by the enforcement of the forum selection clause.  *Atl. Marine*, 571 U.S. at 63 ("The enforcement of valid forum-selection clauses … furthers vital interests of the justice system." (internal quotation marks and citations omitted)).

Lender Defendants do not even attempt to demonstrate how these factors favor a transfer. (Motion at 23-25.)

The remainder of Lender Defendants' justifications for its transfer request can be dismissed out of hand.  That the Bankruptcy Court retained jurisdiction to resolve disputes concerning <u>the Sale Order</u> is irrelevant here, as Plaintiffs' claims do not take issue with the Sale Order, and Lender Defendants only rely on the Emergency Motion Order (not the Sale Order) to argue that their actions were previously "authorized" by the Bankruptcy Court.  (Motion at 21.)  Moreover, simply because the Bankruptcy Court may also possess jurisdiction over Plaintiffs' claims says nothing about whether a transfer is appropriate under Section 1404(a) or 1412.  Finally, all of the cases cited by Lender Defendants in support of their position are all "core" proceedings (which this action is not), and none concerned mandatory forum selection clauses (which this action does).

## <u>CONCLUSION</u>

For all the reasons above, the Court should deny Lender Defendants' Motion.

Dated:   New York, New York
October 4, 2021

MCKOOL SMITH, P.C.

By: */s/ Kyle A. Lonergan*
Kyle A. Lonergan
(klonergan@mckoolsmith.com)
James H. Smith
(jsmith@mckoolsmith.com)
One Manhattan West, 50th Floor
395 9th Avenue
New York, NY 10001
Telephone: (212) 402-9400
Facsimile: (212) 402-9444

John Sparacino (to apply for admission *pro hac vice*)
(jsparacino@mckoolsmith.com)
600 Travis St # 7000
Houston, TX 77002
Telephone: (713) 485-7300
Facsimile: (713) 485-7344